**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-CR-60069-DIMITROULEAS**

**UNITED STATES OF AMERICA**

**v.**

**NICHOLAS BEARDSLEE,**

**Defendant.**

_____/

**UNITED STATES' RESPONSE TO DEFENDANT'S**
**MOTION TO SUPPRESS STATEMENTS [DE 13]**

The United States of America, through the undersigned Special Assistant United States Attorney, hereby files this Response to Defendant Nicholas Beardslee's Motion to Suppress Evidence [DE 13], and in opposition thereto states as follows:

**I. FACTUAL BACKGROUND** [1]

On October 28, 2015, the San Antonio Division of the FBI executed a search warrant and interviewed the subject of their investigation.  During his interview, the subject provided that he used the telephone application known as Kik Messenger to collect and distribute child pornography.   The subject advised

---

[1] These facts are based upon what the United States believes the evidence at trial will demonstrate.

1

that he chats with people using the Kik Messenger and trades images and videos of child pornography with those users. The subject also advised that he uses the cloud storage services Dropbox and Mega in order to receive and store child pornography. He explained that on Kik Messenger he posts links to child pornography on these cloud services and in turn he receives links to cloud storage files from other Kik users, many of which contain child pornography.

A forensic analysis was conducted of the Kik messaging application stored on the Subject's Apple iPhone. The forensic analysis revealed a large number of images and videos, many depicting children engaged in sexually explicit conduct. These included infants, newborns, bondage, bestiality, and torture. It was determined that the subject of the San Antonio Division's investigation was a member of a Kik Messenger group titled "youngtorture." The subject joined "youngtorture" on or about October 21, 2015. There were approximately thirty members in this group. One of the other members of the "youngtorture" group was Kik username "rogerthatoverover." Kik username "rogerthatoverover" posted image files from videos that depicted young prepubescent female children, naked, bound with ropes and engaged in sexual activity with adult males. During the same time period other users in the group posted images depicting nude young children bound, gagged, whipped and bleeding, and engaged in sex acts with adults.

Pursuant to their forensic analysis, the San Antonio Division further advised that "rogerthatoverover" was also an administrator for a second Kik group which shared the same type of images as mentioned above. The user "rogerthatoverover" also posted images to this group as well of prepubescent children bound and engaged in sexual activity with adults.

On December 2, 2015, the San Antonio Division issued an administrative subpoena to Kik Messenger for all members of the "youngtorture" group, to include Kik username "rogerthatoverover." On December 3, 2015, Kik Messenger responded to the administrative subpoena and provided the most recent IP addresses used to access Kik Messenger by "rogerthatoverover. On February 1, 2016, an administrative subpoena served on Comcast for subscriber information for the IP address 67.191.1.24 revealed that for the dates and times listed above the IP address was assigned to an individual with the last name Beardslee residing at 2601 SE 7th Street, Pompano Beach, Florida.

On March l4, 2016, a federal search warrant was served at the residence located at 2601 SE 7th Street, Pompano Beach, Florida. It was determined that Nicholas Beardslee, his wife and their two minor children resided at that address. At the scene, computer forensic examiners conducted a forensic preview of Beardslee's iPhone. FBl computer forensic examiners found the Kik Messenger application on the iPhone. The Kik application

settings on the iPhone were accessed, and the Kik username was determined to be "rogerthatoverover,".   In addition, several Kik message threads were found in the Kik application. In those threads Kik user "rogerthatoverover" had posted images of prepubescent females engaged in sexual activity with adults, some of which were bound with ropes. It was also determined that Kik user "rogerthatoverover" also received images of children as young as infants and toddlers engaged in sexual activity with adults.

During the execution of the search warrant Agents sat down with Beardslee in his living room and explained the nature of the search warrant and began to interview him. They informed Beardslee that he was not under arrest and was under no obligation to speak with them. After being asked some questions regarding the families Internet service provider and what electronics were in the home, Beardslee indicated that he would like to speak with an attorney. This occurred about 20 minutes after entry into the home, about 6:20 a.m. The interview was immediately stopped.

The agents finished executing the warrant which included the forensic preview of his cellular phone. During this time Beardslee sat on the couch in the living room. He was not under arrest, nor was he restrained.   The agents did not finish searching the residence until about 8:00 a.m. It wasn't until after the warrant had been executed and agents were ready to exit the

residence that Beardslee was placed under arrest and handcuffed which was about 8:15 a.m.

Once Beardslee was placed in the FBI vehicle for transport to the Marshals he was told where he was headed and what would occur next with him.  In response to questions from the Defendant, the agents informed him that he would likely have his initial appearance before the Judge the next day and if he could not afford an attorney one would be appointed to represent him.  Agents further explained that the case usually concludes with either a guilty plea or a trial.  Furthermore, the Agents told him that they would be interested in speaking with him after he obtained at Attorney.  Beardslee then asked if he had to wait to speak with an attorney before speaking with them. It was explained to him that he would have to speak with an Attorney before speaking with them. Beardslee expressed concern that it might be awhile before he could speak with his attorney and asked to change his mind and speak with Agents at that moment. It was explained to Beardslee that the Agents were not sure if he could give a statement since he had invoked his right to counsel. After arriving at the FBI Office and conferring with the Assistant United States Attorney, Agents asked Beardslee if he still wanted to speak with them without consulting with an attorney. He indicated he did so he was taken to an interview room.

5

Once in the interview room, which was about 9:30 a.m., Beardslee was advised of his Miranda rights via the FBI Advice of Rights Form. Beardslee was asked to read each right out loud and asked to initial each right if he understood it. He did this. He was then asked if he wanted to waive his rights and answer questions without an attorney present. He indicated he did and signed the waiver of his rights. The interview was audio and video recorded. Beardslee admitted to using the Kik Messenger application on his iPhone 6. He stated that his screen name on Kik Messenger was "Sam" and that his Kik username was "rogerthatoverover,". Beardslee admitted to receiving and sending child pornography over the Kik Messenger application. He also admitted to being a member of Kik groups which consist of other individuals who send and receive child pornography over Kik Messenger. He advised that he believes that some of the group members produce child pornography and some molest children. Beardslee also advised in a written statement that he has been watching pornography of minor children since he was eighteen years old.

During the interview Beardslee agreed to submit to a polygraph examination concerning sexual contact with children.   Prior to the polygraph, Beardslee was once again read his Miranda rights from the FBI Advice of Rights form. Beardslee indicated that he understood his rights and he waived those rights agreeing to speak without an Attorney. He also signed

6

a form agreeing to be polygraphed. Beardslee did ask that the polygraph not be recorded and it was therefore, not recorded. Beardslee provided the polygrapher with two written statements admitting his involvement in the possession and distribution of child pornography, both of which were written by the polygrapher but initialed by the Beardslee.

## II. DISCUSSION

The defendant seeks to suppress his statements on the ground that the statements he made were obtained in violation of the Fifth Amendment to the United States Constitution.   Defense argues that his statements were obtained in violation of the United States Supreme Courts mandates in Miranda v. Arizona, 384 U.S. 436(1966).   The defendant's argument is without merit.

It is well-settled law that any time a defendant is subject to custodial interrogation, the dictates of Miranda v. Arizona, 384 U.S. 436 (1966), are applicable.   Once a person has been given his Miranda warnings, he may waive those rights.   A valid waiver is one that is voluntarily, knowingly and intelligently given.   Id. at 444.   The determination then goes to whether the waiver of those rights was done so voluntarily, knowingly and intelligently.   The Eleventh Circuit has employed the following two-part test when assessing whether a waiver is voluntary, knowing and intelligent:   first, whether the waiver of rights was the product of a free and deliberate choice rather than intimidation, coercion or deception; and second, whether the waiver was made

with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.   United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)(citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). In assessing the validity of a waiver, courts analyze the totality of the circumstances surrounding the interrogation.   Barbour, 70 F.3d at 585.   The government bears the burden of proving that there was a valid waiver of rights. United States v. Parr, 716 F.2d 796, 817 (11th Cir. 1983)(citing Miranda, 384 U.S. at 475).

Defendant contends that after he had requested an attorney and while he was being transported by law enforcement that Agents told him that it would be in his best interest to talk to law enforcement without waiting for an attorney and if he talked to law enforcement they would help him get out of custody on bond. Beardslee claims that relying on law enforcement promises he waived his Miranda rights and submitted to an interview with the agents wherein he gave incriminating statements.

The Defendant was not in custody at the time he requested to speak with an attorney.   He was sitting in his living room with two Agents and was told that he was not under arrest. He was told that they had obtained a search warrant for the search of his home and that they were there to execute it.   The Agents asked the Defendant who provided Internet service to his home and he responded Comcast. The Agents then asked what type of phone he and his wife owned. It

8

was at that point that Beardslee asked to speak with an attorney prior to questioning. Once Beardslee told the Agents that he preferred to speak with an attorney before being interviewed all questioning stopped. It was Beardslee who later, after being placed under arrest and while being transported in the FBI vehicle, reinitiated conversation with the Agents and eventually asked to speak with them before consulting with an Attorney.

The United States Supreme Court in Edwards v. Arizona, 451 U.S. 477(1981), 101 S.Ct. 1880, 68 L.Ed.2d 378, held that an accused in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," unless he validly waives his earlier request for the assistance of counsel.  This "rigid" prophylactic rule, Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, supra, 451 U.S., at 484–485, 101 S.Ct., at 1884–1885 (whether accused "expressed his desire" for, or "clearly asserted" his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S., at 444–445, 86 S.Ct., at 1612 (whether accused "indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking"). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further

9

discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. Edwards v. Arizona, supra, 451 U.S., at 485, 486, n. 9, 101 S.Ct., at 1885, n. 9.

In this case the Defendant, when initially questioned by agents at his home requested an attorney.  Based on the Defendant's request for an attorney the agents stopped all questioning. It was not until he had been placed under arrest and being transported to the Marshals, some two hours later, that he initiated discussions with the agents and requested to speak with the agents without the presence of an attorney.

The Defense argues that law enforcement misled or tricked the Defendant into speaking with them, after he had already asked for an attorney, by promising him help in obtaining a bond. This, however, did not happen. Here law enforcement in response to the Defendant's questions explained to the Defendant the Court process in which he was about to face. He was told that he would likely get an Attorney appointed the next day at his initial appearance. When the Defendant changed his mind and asked to speak with the agents before speaking with an Attorney, the Agents told him he would have to wait to speak with an Attorney before offering any cooperation. It was not until the Agents arrived at the FBI and called the Assistant United States Attorney that they learned that the Defendant could change his mind and speak with them as long as he knowingly and intelligently waived the right he had invoked.  The

10

Agents, therefore, after speaking with the AUSA, audio and video recorded the Defendant telling the Agents that he wished to change his mind and speak with them without the presence of an Attorney. The Agents then provided the Defendant with the written Miranda Rights form and had him read each right out loud and then initial each right indicating he understood that right. The Agents then asked the Defendant if he was willing to waive those rights and speak with them without an Attorney and he indicated he did and signed the waiver of his rights form.

The Defendant cites Hart v. Attorney General of the State of Florida, 323 F.3d 884(11th Cir. 2003),   in support of his proposition that his statement was taken in violation of his Fifth Amendment rights to remain silent and to have an attorney present during interrogation.   In Hart, after the suspect signed a waiver form, officers asked what he knew about a homicide. In response, the suspect asked a police officer he trusted whether he should hire a lawyer. The trusted officer then explained to him the pros and cons of hiring an attorney, during which point the officer told him that "honesty wouldn't hurt him". The Court concluded that this statement by the officer contradicted the Miranda warning that anything the suspect said could be used against him in court, thus rendering his subsequent statements the product of deception. Id. At 894-95.

This case is distinguishable from Hart because Beardslee's statements were not the product of deceptive comments by the Agents. It was the Defendant

who initiated contact with the Agents after being placed under arrest and decided to cooperate. The Defendant apparently made a decision that it was in his best interest to cooperate and hope for leniency.

In this case, all evidence indicates that the Defendant's statements were not the product of deception or coercion but were rather the product of a voluntary and calculated decision to cooperate out of self-interest. This case is more factually similar to U.S. v. Valdez, 880 F.2d 1230 (11th Cir. 1989), wherein the police ceased interrogation of the subject as soon as he requested counsel and it was not until several hours later, when being transported to jail, that the defendant began asking questions and subsequently confessed. 880 F.2d 1234. The Eleventh Circuit held that Valdez's statements were admissible under Edwards because police had respected his initial request for counsel and the intervening hours eliminated any residual coercion he might have experienced.

In Henderson v. Dugger, 925 F.2d 1309 (11th Cir. 1991) the Court held that a suspect is free to "change his mind with regard to giving a confession to the police," but that such a confession is admissible only when it is clear the defendant gave it "of his own volition."

In this case, it was the Defendant who, 2 hours after asking for an attorney and while being transported to the FBI Office for processing, initiated the conversation with the Agents and asked if he could change his mind and speak with them. It was then, only after receiving permission from the AUSA, did the

12

Agents record the Defendant asking to speak with them without an attorney present and record the Defendant reading each Miranda right out loud and waiving those rights after initialing each one. Clearly his waiver was knowingly and voluntarily done.  As can be observed on the audio and video tape, the Defendant's behavior was at all times rational.   He was alert and responsive to the Agent's questions.

Additional underlying factors will further support a finding that Defendant's waiver was, knowing, intelligent and voluntary.  See, e.g., Moore v. Dugger, 856 F.2d 129, 134-35 (11th Cir. 1988)(factors commonly considered when evaluating whether valid waiver include the suspect's intelligence and education level, age, familiarity with the criminal justice system, and physical and mental condition).   In this case, Defendant is mature, healthy, articulate and well-educated. The Defendant had familiarity with the criminal justice system and clearly understood his rights as he invoked his right to an attorney before being advised of his Miranda rights.   In fact, the Defendant was trying to bargain for his release by agreeing to provide Agents with information about the identity of a child that was being sexually abused if they agreed to release him. These factors support a finding that the Defendant knowingly and voluntarily waived his Miranda rights.   In short, when all criteria are considered and weighed, the balance overwhelmingly supports a finding that the Defendant was given his Miranda warnings which he knowingly and intelligently waived.

Accordingly, the Government respectfully requests that the Defendant's statements and confession made to Agents be deemed admissible.

Respectfully submitted,

WIFREDO FERRER
UNITED STATES ATTORNEY

By: s/ *M. Catherine Koontz*
M. Catherine Koontz
Special Assistant United States Atty
Court Id A5501929
500 Broward Blvd., 7th floor
Fort Lauderdale, Florida 33394
(954) 660-5940
(954) 356-7336 (Fax)
e-mail: ckoontz@usa.doj.gov

14

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 15, 2016, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.


s/*M.Catherine Koontz*
M.CATHERINE KOONTZ
Special Assistant United States Atty

15